**194**

Marguerite T. O'CONNOR, as Administratrix of the Goods, Chattels and Credits of Daniel J. O'Connor, Deceased, Plaintiff-Appellee,

v.

LEE–HY PAVING CORP. and Davis E. Clem, Defendants-Appellants.

Vincent J. FERRUZZO,
Plaintiff-Appellee,

v.

BRIGHT TRUCKING INC., Joe E. Larson and Landy of Wisconsin, Inc., Defendants-Appellants.

Fontini KOTSONIS, Individually and as Administratrix of the Estate of Padias Kotsonis, Plaintiff-Appellee,

v.

SUPERIOR MOTOR EXPRESS, Earnhardt Lumber Co. and the Estate of Kenneth Edward Bentley, Defendants-Appellants.

Gloria SCHWARTZ and William Schwartz, Plaintiffs-Appellees,

v.

BOSTON HOSPITAL FOR WOMEN, also known as Boston Lying in Hospital, and Luke Gillespie, Defendants-Appellants.

Nos. 845, 846, 849, 851, 878 and 879, Dockets 78–7044, 78–7047, 78–7050, 78–7051, 78–7058 and 78–7076.

United States Court of Appeals, Second Circuit.

Argued April 12, 1978.

Decided June 12, 1978.

Whitney North Seymour, New York City (Roy L. Reardon, Thomas M. Bistline, and Simpson, Thacher & Bartlett, New York City, of counsel), for appellants Lee-Hy Paving Corp. and Davis E. Clem.

Cyrus M. Diamond, New York City (Abraham Fuchsberg, Henry H. Foster, Jr., and Fuchsberg & Fuchsberg, New York City, of counsel), for appellee, Marguerite T. O'Connor, etc.

Leonard A. Robusto, New York City (John J. Langan, New York City, of counsel), for appellants Bright Trucking Inc., Joe E. Larson and Landy of Wisconsin, Inc.

Marvin L. Schwartz, New York City (Elias, Schewel & Schwartz, New York City, of counsel), for appellee Vincent J. Ferruzzo.

Sidney A. Schwartz, New York City (William Paul Last and Alexander, Ash, Schwartz & Cohen, New York City, of counsel), for appellants Superior Motor Express, Earnhardt Lumber Co., the Estate of Kenneth Edward Bentley and appellee Luke Gillespie.

J. Steven Long, Staten Island, N. Y. (James T. Murphy and Decker & Long, Staten Island, N. Y., of counsel), for appellee Fontini Kotsonis, etc.

Solomon M. Cheser, New York City (Tell, Cheser, Breitbart & Lefkowitz, New York City, of counsel), for appellant Boston Hospital for Women.

Cyrus M. Diamond, New York City (Abraham Fuchsberg and Fuchsberg & Fuchsberg, New York City, of counsel), for appellees Gloria Schwartz and William Schwartz.

Robert H. Silk, New York City, for New York State Trial Lawyers Ass'n, amicus curiae.

Before FRIENDLY, GURFEIN and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

We have before us four interlocutory appeals, pursuant to 28 U.S.C. § 1292(b), which raise the question whether *Seider v. Roth*, 17 N.Y.2d 111, 269 N.Y.S.2d 99, 216 N.E.2d 312 (1966), sanctioning a procedure for obtaining jurisdiction in a negligence action by a New York resident against a non-resident defendant for wrongful death or personal injury in an out-of-state accident through attachment of a policy of liability insurance issued by an insurer doing business in New York, the constitutionality of which was upheld by this court in *Minichiello v. Rosenberg*, 410 F.2d 106 (1968), *adhered to en banc*, 410 F.2d 117, *cert. denied*, 396 U.S. 844, 90 S.Ct. 69, 24 L.Ed.2d 94 (1969), has been undermined by *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53

L.Ed.2d 683 (1977). A fifth interlocutory appeal pursuant to 28 U.S.C. § 1292(b) in one of these cases raises an independent question whether the district court was correct in holding that the liability of the defendant was determinable not by Virginia law, under which allegedly no liability could exist, but rather by New York law, under which it could if negligence was established. All four actions were brought by New York resident plaintiffs against nonresident defendants, and federal jurisdiction rested on 28 U.S.C. § 1332.

In each of the four cases the district courts denied motions of the defendants to vacate the attachment of their insurance policies and dismiss the actions. Since the cases are similar so far as the legal question is concerned and the courts in *Schwartz, Kotsonis,* and *Ferruzzo* expressly followed the lead of Judge Dooling's opinion in *O'Connor v. Lee-Hy Paving Corp.,* 437 F.Supp. 994 (E.D.N.Y. 1977), we will state in text only the facts of *O'Connor* and will summarize the three other cases in the margin.[1]

Mrs. Marguerite O'Connor, administratrix of the estate of her husband, Daniel J. O'Connor, sues for personal injuries to and the wrongful death of her husband which occurred in an industrial accident at the construction site of the Regency Square Shopping Center near Richmond, Virginia. Plaintiff alleges that her husband was struck and killed by a motor grader owned by defendant Lee-Hy Paving Corp. and negligently operated by defendant Davis E. Clem, an employee of Lee-Hy. O'Connor was a New York resident and was employed by L. Farber & Co., a New York proprietorship. His duties with Farber included supervising construction of the Regency Square Shopping Center, which took him to the construction site at least one day a

---

1. In *Schwartz v. Boston Hospital for Women,* Docket Nos. 78–7044, 7076 (decided Oct. 21, 1977), Gloria Schwartz and her husband brought suit in the District Court for the Southern District of New York against the Boston Hospital and Dr. Luke Gillespie for medical malpractice alleged to have occurred in Massachusetts when Mrs. Schwartz was at the hospital and under the care of Dr. Gillespie. The Boston Hospital is a Massachusetts corporation and Dr. Gillespie a Massachusetts resident. Jurisdiction over defendants was obtained by attaching the contractual obligations of St. Paul Fire & Marine Insurance Co. and Lumbermen's Mutual Casualty Co., both of which maintain offices in New York, to defend and indemnify the respective defendants under their insurance policies. Although defendants allege that their case is distinguishable from the others before us on the basis that the plaintiffs were not New York residents at the time of the alleged malpractice, Judge Lasker had earlier found that plaintiffs were New York domiciliaries at that time. *Schwartz v. Boston Hospital for Women,* 71 Civ. 1562 (September 29, 1975), at 2–3. We sustain that conclusion.

The plaintiff in *Kotsonis v. Superior Motor Express,* Docket No. 78–7058 (decided Dec. 6, 1977), sued in the District Court for the Eastern District of New York, individually and as administratrix of the estate of her husband, Padias Kotsonis, for damages resulting from an accident in Maryland in which the decedent's truck was struck by a vehicle owned by Superior Motor Express, which was towing a trailer owned by Earnhardt Lumber Co. and was driven by Kenneth Bentley, an employee of Earnhardt. Kotsonis was a New York resident. All of the defendants are residents of North Carolina and do not transact business in New York. Plaintiff obtained an order of attachment of the contractual obligation of Kemper Insurance Co. to defend and indemnify the defendants. Kemper does business in the state of New York. Judge Nickerson denied the defendants' motions to vacate both the service of process and the order of attachment, or alternatively to dismiss or transfer the case on the ground of *forum non conveniens.* Only the former ruling is before us.

The plaintiff in *Ferruzzo v. Bright Trucking Inc.,* Docket No. 78–7047 (decided Dec. 22, 1977), sustained injuries in a collision in Indiana as a result of the allegedly negligent operation of a tractor-trailer owned by Landy of Wisconsin, Inc., a Wisconsin corporation, leased by Bright Trucking, Inc., a Minnesota corporation, and driven by Joseph Larson, an employee of Landy and a resident of Wisconsin. Plaintiff is a resident of New York and is employed by a New York firm for which he was transporting inventory at the time of the accident. He brought suit in the District Court for the Eastern District of New York and obtained jurisdiction over defendants Landy and Larson by attaching the obligation of Hartford Accident & Indemnity Co., which does business in New York, to defend and indemnify them pursuant to its insurance policy with Landy. Plaintiff moved to confirm the order and defendant cross-moved to vacate it or in the alternative to transfer venue to Indiana. Judge Sifton of the Eastern District granted the plaintiff's motion and denied the defendants'.

week, and frequently three or four times a week. He was on an overnight visit when he was killed on September 25, 1975. Defendant Lee-Hy is a Virginia corporation which transacts no business in New York. Defendant Clem is an employee of Lee-Hy and a resident of Virginia, who has no contacts with New York.

Plaintiff filed her complaint in the District Court for the Eastern District of New York on November 6, 1975 and thereafter moved for an order pursuant to New York Civil Practice Law and Rules § 6201 to attach the contractual obligations of Royal-Globe Insurance Co. and Continental Casualty Co. to defend and indemnify Lee-Hy under its insurance policies. Both insurance companies do business in New York and have offices in the state, but neither lists New York as its principal place of business.

The requested order was granted on December 9, 1975. On July 22, 1977, a month after the *Shaffer* decision, defendants made the motion here at issue, which Judge Dooling denied in a carefully considered opinion on September 27, 1977, 437 F.Supp. 994. On October 14, 1977, he certified interlocutory appeals from his decision and also from an earlier order concerning the choice of law issue indicated above. This court granted defendants' petition for leave to appeal both orders on January 23, 1978. This appeal followed.[2]

## I.

Appellants' attack on the decisions below is simple and straightforward. In their

---

**2.** There have been a number of decisions on the jurisdictional issue other than those before us. In *Emsheiner v. Callahan*, No. 76 C 325 (E.D. N.Y., Oct. 19, 1977), Judge Pratt raised the issue of the continued viability of *Seider* after *Shaffer*. Both counsel agreed that Judge Dooling's opinion in the *O'Connor* case had resolved the issue, and Judge Pratt entered an order accordingly.

One month later, in *Torres v. Towmotor Division of Caterpillar, Inc.*, Civ. No. 77C 1810 (E.D. N.Y. Nov. 18, 1977), Judge Bramwell denied the plaintiffs' motion for an attachment order on the ground that *Seider v. Roth, supra*, 17 N.Y.2d 111, 269 N.Y.S.2d 99, 216 N.E.2d 312, had been undermined by *Shaffer*. *Torres* was a products liability action by a New York resident against the manufacturer and distributor of a forklift which injured him in the course of his employment in New Jersey. The plaintiff sought to obtain jurisdiction in New York over the distributor, a New Jersey corporation, by attaching its insurer's obligation to defend and indemnify the corporation. After reviewing the development of the *Seider* line of cases and our opinions upholding the constitutionality of *Seider*, Judge Bramwell ruled that the *Seider* procedure was not a direct action against the insurer and did not fulfill the minimum contacts requirement of *Shaffer* and concluded that *Harris v. Balk*, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1905).

> was the seed from which *Seider* evolved and it provided the roots through which *Seider* was nourished. Thus, since this seed has been pulled and its roots have been severed from the fertile field of legal precedent by *Shaffer, Seider*'s viability has likewise been quashed.

*Torres, supra*, at 36. For reasons not known to us, this decision has not been appealed. Judge Sifton in *Ferruzzo* and Judge Nickerson in

*Kotsonis* had both the *O'Connor* and the *Torres* opinions before them in rendering their decisions upholding the constitutionality of *Seider* in December, 1977.

A number of New York state courts have also considered the question. The Fourth Department of the Appellate Division upheld the constitutionality of *Seider* and its progeny in *Alford v. McGaw*, App.Div., 402 N.Y.S.2d 499 (1978). There, New York plaintiffs who were injured in Ontario, Canada when their car was struck by the defendant's car brought an action for damages in New York. Plaintiffs obtained jurisdiction over the defendant, a resident of Ontario, by attaching the obligation of the Hartford Fire Insurance Co., which does business in the state of New York, to defend and indemnify him. The Appellate Division upheld the trial court's refusal to vacate the attachment because the relationship of the insurance company's debt to the cause of action and the company's central role in the litigation satisfied the minimum contacts test prescribed by *Shaffer*.

Lower courts in New York have come out on both sides of the question. Compare *Rodriguez v. Wolfe*, Sup., 401 N.Y.S.2d 442; *Nelson v. Warner Bros. Jungle Habitat*, N.Y.L.J., 3/17/78, p. 7, col. 1; *Smith v. Kraftco Corp.*, N.Y.L.J., 3/24/78, p. 12, col. 3, upholding *Seider*; with *Kennedy v. Deroker*, 91 Misc.2d 648, 398 N.Y.S.2d 628 (1977); *Katz v. Umansky*, 92 Misc.2d 285, 399 N.Y.S.2d 412 (1977); *Wallace v. Target Store, Inc.*, Sup., 400 N.Y.S.2d 478 (1977); *Hutchinson v. Hayes Bros., Inc.*, N.Y. L.J., 3/17/78, p. 4, col. 2; *Schoen v. Berotti*, N.Y.L.J., 3/17/78, p. 7, col. 3, finding *Seider* attachment unconstitutional.

view, *Shaffer* conditions the exercise of what has been called *quasi in rem* jurisdiction, more particularly the exercise of jurisdiction where the ownership of property within the state is used to subject the defendant to its courts,[3] on the existence of at least some other "contacts" between the defendant and the state. In these four cases there are admittedly no contacts between the named defendants and New York. Although appellants consider this argument alone to be dispositive, they add other makeweights. They contend that in sustaining the constitutionality of *Seider,* both the New York Court of Appeals in *Simpson v. Loehmann,* 21 N.Y.2d 305, 310, 287 N.Y.S.2d 633, 636, 234 N.E.2d 669, 671 (1967), *motion for reargument denied,* 21 N.Y.2d 990, 290 N.Y.S.2d 914, 238 N.E.2d 319 (1968), and this court in *Minichiello v. Rosenberg, supra,* 410 F.2d at 117–18, rested squarely on *Harris v. Balk, supra,* 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023. Since *Shaffer* clearly overruled *Harris* on its own facts, 433 U.S. at 208–09, 97 S.Ct. at 2582–2583, 53 L.Ed.2d at 700–01, *Seider,* they say, must fall with it. By way of minimizing the Court of Appeals' determination in *Simpson* that *Seider* comports with the *In-*

*ternational Shoe* fairness standard, they point to Chief Judge Fuld's remark in that case inviting the New York Law Revision Commission and the Advisory Committee of the Judicial Conference "to conduct studies in depth and make recommendations with respect to the impact of *in rem* jurisdiction on not only litigants in personal injury cases and the insurance industry but also our citizenry generally." 21 N.Y.2d at 312, 287 N.Y.S.2d at 638, 234 N.E.2d at 672. This task, they suggest, has now been performed by a still more august body, the Supreme Court of the United States.[4]

If the plaintiffs in these cases had "attached" the debt to defendants of a debtor only transitorily in New York, as in *Harris v. Balk,* or even bank accounts maintained by them in New York, we would readily agree that attachment jurisdiction could not be sustained when, as here, the defendants had no other "contacts" with New York. In such a case, *Shaffer v. Heitner* clearly forbids a state from depriving a defendant of his property in the debt that is owed him unless other contacts make it fair to do so. See *Intermeat, Inc. v. American Poultry Incorporated,* 575 F.2d 1017 (2 Cir. 1978). What sharply differentiates these

---

**3.** The Restatement Second of Judgments, § 11, calls this "attachment jurisdiction". (Tent. Draft No. 5, March 10, 1978). This description is useful since, unlike the more general term "quasi in rem jurisdiction," it differentiates the cases with which we are concerned from those where "claims to the property itself are the source of the underlying controversy between the plaintiff and the defendant," *Shaffer, supra,* 433 U.S. at 207, 97 S.Ct. at 2582, 95 L.Ed.2d at 700, and we shall use it.

**4.** It is difficult to fathom how a Supreme Court decision which mandates the very type of inquiry in which the Court of Appeals engaged can fill the office that appellants ascribe to it. Quite clearly, what Judge Fuld sought was information concerning the practical consequences of the *Seider* attachment procedure, information which significantly has not been forthcoming in these proceedings. See p. 202 *infra.*

Inherent in appellants' brief and argument is a contention that, as is claimed to be evidenced by Judge Breitel's concurrence for himself and Judge Bergan in *Simpson, supra,* 21 N.Y.2d at 314–16, 287 N.Y.S.2d at 640–42, 234 N.E.2d at 674–75, by *Neuman v. Dunham,* 39 N.Y. 2d 999, 387 N.Y.S.2d 240, 355 N.E.2d 294

(1976), and by *Donawitz v. Danek,* 42 N.Y.2d 138, 141–42, 397 N.Y.S.2d 592, 594–95, 366 N.E.2d 253, 254–56 (1977), the New York Court of Appeals is disenchanted with *Seider,* clings to it only because of "considerations of institutional stability and the mandates of *stare decisis,*" *Donawitz, supra,* 42 N.Y.2d at 142, 397 N.Y.S.2d at 595, 366 N.E.2d at 255, and would welcome a decision that *Shaffer* has supplied the needed excuse for departing from precedent. Of course, the Court of Appeals is entirely free to reexamine *Seider* on its merits and conclude that, in light of the general illumination afforded by *Shaffer* or otherwise, its continued existence is undesirable as a matter of New York law. Our holding is simply that, on the basis of what is now before us, we do not find the *Seider* attachment procedure so offensive to "traditional notions of fair play and substantial justice," *Shaffer, supra,* 433 U.S. 203, 205, 206, 211, 212, 97 S.Ct. at 2579, 2580, 2581, 2584, 53 L.Ed.2d 683, 698, 699, 702, 707; *Kulko v. Superior Court of California,* —— U.S. ——, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978), as to violate the due process clause of the Fourteenth Amendment.

cases from those just hypothesized is that a judgment for the plaintiff will not deprive a defendant of anything substantial that would have been otherwise useful to him. He could not recover, sell or hypothecate the covenant to indemnify; its utility is solely to protect him from liability and in an appropriate case to allow the plaintiff to recover from the insurer under § 167(1)(b) of the New York Insurance Law.[5] What we said in *Minichiello, supra,* nine years ago *apropos* of *Harris v. Balk* remains just as true today:

> [A]ppellants' problem is significantly less serious than was Balk's in several respects. Balk had to decide whether to hire a Maryland lawyer to protect his interest in the $180 debt Harris owed him; the appellants are entitled to have lawyers in New York furnished by their insurers without expense. The Maryland judgment deprived Balk of money he could have used for whatever purpose he willed; *a Seider judgment would mean simply that liability policies, on which appellants could not have realized for any purpose other than to protect themselves against losses to others, will be applied to the very objective for which they were procured.*

410 F.2d at 118 (emphasis supplied). Moreover, since the insurance policy was purchased to protect against the type of liability which is the subject of the lawsuit and since the obligation to defend clearly encompasses the litigation, *Seider* does not sanction "the type of *quasi in rem* action typified by *Harris v. Balk* and the present case [sequestration of shares in a Delaware corporation]", where the property which "serves as the basis for . . . jurisdiction is *completely unrelated* to the plaintiff's cause of action," *Shaffer v. Heitner, supra,* 433 U.S. at 208–09, 97 S.Ct. at 2582, 53 L.Ed.2d at 700–01 (emphasis supplied).[6] The fall of *Harris v. Balk* therefore does not necessarily topple *Seider,* and it is necessary to probe more deeply than appellants would have us do.[7]

---

5. It might be contended that a judgment up to the policy limits would exhaust the protection of the insurance policy and thereby expose the defendant to a subsequent suit for damages in *excess* of those limits in a forum where *in personam* jurisdiction over him could be acquired. However, the imposition on the defendant in this respect is not greater than that effected by a direct action against the insurer, which we found permissible in *Minichiello, supra,* 410 F.2d at 110. See note 7 *infra.*

  If it be contended that the line of argument in text emphasizes the questionability of the *Seider* holding that the insurer's obligation of indemnification was a "debt" attachable under New York CPLR 5201 and 6202, the answer is that this is solely a question of New York law which the Court of Appeals has authoritatively decided. See *Elmendorf v. Taylor,* 23 U.S. (10 Wheat.) 152, 159–60, 6 L.Ed. 289, 292 (Marshall, C. J.).

6. Some of the appellants argue that the vacating and remanding of *Savchuk v. Rush,* 245 N.W.2d 624 (Minn.Sup.Ct.1976), a case upholding a *Seider* attachment, for further consideration in light of *Shaffer,* see 433 U.S. 902, 97 S.Ct. 2964 (1977), indicates that the Supreme Court believed that contacts other than those between the plaintiff and the insurer were necessary to sustain jurisdiction. This reads too much into the Court's action. At most, it was an affirmation of the Court's declared unwillingness to determine at that time the extent to which jurisdictional doctrines other than those before it in *Shaffer* were affected by the decision. See *Shaffer, supra,* 433 U.S. at 208 n.30, 212 n.39, 97 S.Ct. at 2582 n. 30, 2585 n. 39. In any event, *Rush* is not so strong a case for upholding jurisdiction as this one since the plaintiff there resided at the time of the accident in the state in which the accident occurred and only subsequently moved to Minnesota. The dissent in *Rush* argued that sustaining jurisdiction under these circumstances in effect allowed the plaintiff a choice of 50 jurisdictions in which to sue. See *Farrell v. Piedmont Aviation,* 411 F.2d 812 (2 Cir.), *cert. denied,* 396 U.S. 840, 90 S.Ct. 103, 24 L.Ed.2d 91 (1969); *Fish v. Bamby Bakers, Inc.,* 76 F.R.D. 511 (N.D.N.Y. 1977) (residence in New York at time of accident necessary to sustain *Seider* attachment).

7. This is recognized in the Restatement Second of Judgments at 84–86 (Tent. Draft No. 5, March 10, 1978). Referring to the *Seider* problem this states that

> The jurisdictional question would seem to be the same for both "direct action" and attachment jurisdiction. If the circumstances that the plaintiff is a resident of State X and the insurance company is doing business there are sufficient to sustain *in personam* jurisdiction for a "direct action" against the insurer, they should *also* be sufficient to sustain attachment jurisdiction against the insurer, and vice versa.

  (Emphasis supplied). As developed below, we held in *Minichiello* that these circumstances

The overriding teaching of *Shaffer* is that courts must look at realities and not be led astray by fictions. Quoting the Restatement Second of Conflict of Laws, § 56, introductory note, Mr. Justice Marshall explained that "[t]he phrase 'judicial jurisdiction over a thing,' is a customary elliptical way of referring to jurisdiction over the interests of persons in a thing" and held in consequence that "in order to justify an exercise of jurisdiction *in rem*, the basis for jurisdiction must be sufficient to justify exercising 'jurisdiction over the interests of persons in a thing.'" 433 U.S. at 207, 97 S.Ct. at 2581, 53 L.Ed.2d at 699–700. This need for a realistic approach had been recognized by Chief Judge Fuld when he wrote in *Simpson, supra,* 21 N.Y.2d at 311, 287 N.Y.S.2d at 637, 234 N.E.2d at 672:

> The historical limitations on both in personam and in rem jurisdiction, with their rigid tests, are giving way to a more realistic and reasonable evaluation of the respective rights of plaintiffs, defendants and the State in terms of fairness. (See, e. g., *International Shoe Co. v. Washington,* 326 U.S. 310 [, 66 S.Ct. 154, 90 L.Ed. 95]; *McGee v. International Life Ins. Co.,* 355 U.S. 220 [, 78 S.Ct. 199, 2 L.Ed.2d 223]; *Longines-Wittnauer Watch Co. v. Barnes & Reinecke,* 15 N.Y.2d 443, [261 N.Y.S.2d 8, 209 N.E.2d 68]). Such an evaluation requires a practical appraisal of the situation of the various parties rather than an emphasis upon somewhat magical and medieval concepts of presence and power. Viewed realistically, the insurer in a case such as the present is in full control of the litigation; it selects

the defendant's attorneys; it decides if and when to settle; and it makes all procedural decisions in connection with the litigation.[8]

Moreover, as we said in the passage from *Minichiello* quoted above, a plaintiff's judgment in a *Seider* type case does not deprive the defendant of money; the full force of the judgment rests on the insurer. As Judge Dooling stated below, 437 F.Supp. at 1002:

> *Seider v. Roth* and *Simpson* are *sui generis* in the field of jurisdiction. They cannot be pigeon-holed as *in rem* or *in personam.* They are in real terms *in personam* so far as the insurer is concerned. For the named defendant the suit is only an occasion of cooperation in the defense; his active role is that of witness. It is beside the point to test the constitutionality of the procedure in terms of the named defendant; his role as a party is hardly more real than that of the casual ejector Richard Roe in common law ejectment actions. What is at stake in the suit is the plaintiff's claim for the payment of his alleged damages by the insurer.

■ Thus, we must first determine whether forcing the insurer to defend in New York is so unfair as to violate due process. Nothing in *Shaffer* affects so much of our prior decision in *Minichiello* as holds that an insurer doing business in New York has no justifiable ground for complaint at New York's asserting a jurisdiction over the insured which, by virtue of § 167(1)(b) of the New York Insurance Law,

---

*were* sufficient to sustain *in personam* jurisdiction in a direct action against the insurer, 410 F.2d at 109–10, and nothing in *Shaffer* reflects adversely on that conclusion.

**8.** Judge Dooling put the point even more forcefully in the *O'Connor* case, *supra,* 437 F.Supp. at 1003:

> The emphasis in many of the cases on the supposedly contingent nature of the insurer's obligation appears to be misplaced. The occurrence of the accident, the plaintiff's injuries, and the insured's connection with the accident are determinative events. To be sure there may never be a suit, but the insured is under an immediate duty to give

prompt notice of the accident to the insurer. Investigation usually commences at once, and the parties in interest, potential plaintiff, insurer and insured are identified. Control of investigation, defense and settlement are in the insurer's hands. The prospective plaintiff's relationships are with the insurer, not with the insured. When an action is commenced the insurer controls the conduct of the defense, and, if the suit is in a federal court, plaintiff may obtain discovery of the existence and content of any relevant insurance agreement (Rule 26(b)(2)).

See also *Kirchen v. Orth,* 390 F.Supp. 313, 318–19 (E.D.Wis.1975).

may result in a judgment requiring the insurer to pay the plaintiff up to the policy limit. Doing business in the state continues to be a recognized basis for the existence of *in personam* jurisdiction over a corporation. See Restatement Second of Conflict of Laws, § 47, adopted in Restatement Second of Judgments, *supra*, § 8a (Tent. Draft No. 5); *International Shoe Co. v. Washington*, 326 U.S. 310, 317–19, 66 S.Ct. 154, 158–59, 90 L.Ed. 95, 102–04 (1945).[9] There is no point in rehashing the arguments concerning the inconvenience to the insurer in being obliged to try the issue of liability in a state that may be far removed from the site of the accident. All these considerations were fully canvassed in *Minichiello, supra*, 410 F.2d at 110, where we pointed out, citing *Buckley v. New York Post Corp.*, 373 F.2d 175, 181 (2 Cir. 1967), which quoted von Mehren & Trautman, Jurisdiction to Adjudicate: A Suggested Analysis, 79 Harv.L.Rev. 1121, 1128 (1966), that there has been " 'a movement away from the bias favoring the defendant' in matters of personal jurisdiction 'toward permitting the plaintiff to insist that the defendant come to him' when there is a sufficient basis for doing so." Here the sufficient basis is furnished by the insurer's maintaining an office and regularly transacting business in New York—not to speak of the convenience to the plaintiff in having a trial where witnesses on damages will be more readily available and the fact that in the large proportion of these actions that are settled the insurer usually has no particular interest in requiring the action to be brought at the site of the accident or the residence of the insured.[10] It is plain that, on this aspect of the problem, *Shaffer* has wrought no change in the law.

This, however, is not the end of the inquiry since, as recognized in *Minichiello, supra*, 410 F.2d at 110–13 (panel opinion), 117–19 (*en banc* opinion), we must also consider whether sustaining *Seider* jurisdiction would be unfair to the nominal defendant, the insured—even though, as Judge Dooling noted, 437 F.Supp. at 1003, it is somewhat ironical that "it is the insurer, the one who is responsible for the defense of the suit and for the payment of any judgment, and who is itself unable to deny that it is fully suable in the state, who puts forward the plea to jurisdiction in the name of the nominal defendant, who will not pay the judgment, nor manage the defense."

When the constitutionality of *Seider* was last before us, our chief concern in this regard was whether a *Seider* judgment, although limited in New York to the amount of the policy, might be given collateral estoppel effect in some other state, at least as to issues actually litigated, see 410 F.2d at 111–12. We concluded, *id.*, that:

> Whatever the right rule may be as to *quasi in rem* judgments generally, we think it clear that neither New York nor any other state could constitutionally give collateral estoppel effect to a *Seider* judgment when the whole theory behind this procedure is that it is in effect a direct action against the insurer and that the latter rather than the insured will conduct the defense.

---

9. Section 47 of the Restatement Second of Conflict of Laws states:

   (1) A state has power to exercise judicial jurisdiction over a foreign corporation which does business in the state with respect to causes of action arising from the business done in the state.

   (2) A state has power to exercise judicial jurisdiction over a foreign corporation which does business in the state with respect to causes of action that do not arise from the business done in the state if this business is so continuous and substantial as to make it reasonable for the state to exercise such jurisdiction.

While there are no findings as to the substantiality or continuity of the insurers' business dealings in New York, appellants have not contested that this is "continuous and substantial." See *Beja v. Jahangiri*, 453 F.2d 959 (2 Cir. 1972), which discusses the standard for what constitutes "doing business" in New York in order to support a *Seider* attachment.

10. If it be said that even in such cases the insurer may be prejudiced by fear of the supposedly greater liberality of New York juries, we fail to see why this interest is superior to that of a New York resident in having damages assessed by a jury of the state of his residence. Certainly any such interest of the insurer is not of constitutional magnitude.

This conclusion has been reinforced both by portions of the Restatement Second of Judgments making numerous exceptions to the rule of issue preclusion which would clearly include a *Seider* judgment, see § 68.1 (Tent. Draft No. 4, April 15, 1977), § 88 (Tent. Draft No. 3, April 15, 1976), § 75(c) (Tent. Draft No. 1, March 28, 1973); see also Reporters Note, *id.* at pp. 215–16 ('[i]n some contexts [involving attachment jurisdiction, issue] preclusion may be inconsistent with the requirements of due process . . . . But *absent any constitutional constraint,* it is believed that issue preclusion is appropriate." (emphasis supplied)), and by the emphasis on fair play in *Shaffer* itself. Our statement in *Minichiello,* "we cannot fairly hold that New York has denied due process merely because of the possibility that some other state may do so", 410 F.2d at 112, has even greater force when, as we now see it, the "possibility" has declined to the vanishing point.

With respect to other alleged hardships on the insured we see no occasion to add to our discussion in *Minichiello* beyond saying two things: The first is that we find some significance in the fact that although *Seider* has been the law of New York since 1966, appellants, represented by highly capable counsel, have not brought to our attention a single instance where any of the anticipated "horribles"—inability or refusal of the insured to appear in New York for deposition or trial, see 410 F.2d at 112, 118, failure to assert a counterclaim, see 410 F.2d at 112–13, and "multiple claims where the damages exceed the policy limits and the insured is without funds to pay the excess", see 410 F.2d at 119—has occurred. The second is that we deal only with the cases before us; in holding that application of *Seider* in these cases does not offend *Shaffer* we are not saying that a case where such application might violate due process could never arise.[11]

We therefore affirm the four orders declining to vacate the "attachments" of the liability policies and to dismiss the actions for want of jurisdiction.

## II.

The other interlocutory appeal allowed in the *O'Connor* case raises a choice of law question. Some further statement of the facts is required.

On April 16, 1974, Regency Square, Inc., a Virginia corporation, Leonard L. Farber, and E. Carlton Wilton, a Virginia real estate developer, formed Quioccasin Associates as a limited partnership with Regency Square, Inc. as the general partner. The purpose of the partnership was "to develop and operate a regional shopping center known as Regency Square Shopping Center . . . ." On the same date, Quioccasin, Regency Square, Inc. (for itself and as general partner of Quioccasin), Leonard L. Farber of Florida, Inc., along with Wilton Leasing, Inc., and E. Carlton Wilton, Inc., both Virginia corporations, entered into an agreement providing in relevant part that Quioccasin would become lessee of the acreage on which the project was to be built, develop a regional shopping center to be called Regency Square Shopping Center, and engage "the services of Farber [of Florida] as developer and advisor" for the Regency Square Shopping Center. Farber was to perform its services as an independent contractor until construction was complete and 95% of the leasable area had been rented or sold and was open for business.

Lee-Hy contracted directly with Quioccasin, by the general partner, Regency Square, Inc., to engage in grading, paving and other specified work on the center. Lee-Hy was brought into the project by an employee of Farber of Florida, and its contract was negotiated by the decedent O'Connor. O'Connor was employed by Far-

11. Although the argument may not be articulated as such, appellants' attack seems to rest in some measure on a general view that since *Seider* was regarded in many quarters as an extreme application of attachment jurisdiction, it should be among the first victims of *Shaffer.*

See also Leflar, American Conflicts Law § 25 (3d ed. 1977). This ignores the *sui generis* nature of *Seider* jurisdiction as outlined by Judge Dooling, 437 F.Supp. at 1002, and as analyzed above.

ber of New York, which was not a party to the Quioccasin agreement, but he performed services regularly for Farber of Florida in connection with construction of the shopping center and was doing this at the time of the accident that caused his death. He was covered under New York Workmen's Compensation Law by Farber of New York, and his widow has received death benefits under the New York compensation law.

After extensive discussion of Virginia's workmen's compensation statutes, 9A Virginia Code §§ 65.1–5, –29, –35, –40, –103, and decisions of state and federal courts construing them, the district judge found that Quioccasin, Farber, and Lee-Hy were in the "same employ" for purposes of the Virginia compensation statutes; i. e., all were engaged in developing the Regency Square Shopping Center, and that under Virginia law Mrs. O'Connor's sole remedy would be the recovery of the benefits provided in the Virginia workmen's compensation statutes and no damage action would lie against Lee-Hy or Clem. It is not disputed that, under § 29(6) of the New York Workmen's Compensation Law, which provides that rights under the compensation law are exclusive "when such employee is injured or killed by the negligence . . of another in the same employ," Mrs. O'Connor would not be barred from suing Lee-Hy and Clem for wrongful death occasioned by their negligence. The district judge held that New York would apply its law and consequently granted a motion by the plaintiff to strike an affirmative defense based on the Virginia workmen's compensation statutes and denied a motion by defendants for summary judgment on the same basis.

The question we must determine is what law a New York court seized of the *O'Connor* action would apply. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

Appellants do not contend that New York is constitutionally required to apply Virginia law. *Carroll v. Lanza,* 349 U.S. 408, 75 S.Ct. 804, 99 L.Ed. 1183 (1955), which dealt with the converse situation where the law of the state of employment barred third party suits but the law of the state of the accident, which was also the forum, did not, and Restatement Second of Conflict of Laws, § 183, make it plain that New York is constitutionally free to apply its own law if it chooses.

Appellants mount a strong case that New York would—or in any event should—apply Virginia law. Recognizing that *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963), represented a departure from the *lex loci delictus* rule, which would here dictate application of Virginia law, they assert that Virginia's "contacts" far outweigh New York's and that New York's interest in seeing that O'Connor's representatives receive adequate compensation for his death must be harmonized with the policy of limiting the costs imposed on employers by industrial accidents, which would dictate following Virginia law. They emphasize that Lee-Hy planned its insurance program on the justifiable assumption that all work-related accidents on the job site would be governed by workmen's compensation and that allowing an action for damages would run counter to Lee-Hy's reasonable expectations.[12] Appellants rely also on § 184 of the Restatement Second of the Conflict of Laws, which states:

Recovery for tort or wrongful death will not be permitted in any state if the defendant is declared immune from such liability by the workmen's compensation statute of a state under which the defendant is required to provide insurance against the particular risk and under which

(a) the plaintiff has obtained an award for the injury, or

12. We do not find this argument particularly impressive since the record shows that Lee-Hy carried insurance for liabilities other than those covered by the workmen's compensation statutes to a policy limit of $2,000,000. Although the affidavit of Lee-Hy's president is ambiguous, we do not understand it to aver that Lee-Hy's policies do not cover the accident involving O'Connor. No such defense has been asserted.

(b) the plaintiff could obtain an award for the injury, if this is the state (1) where the injury occurred, or (2) where employment is principally located, or (3) where the employer supervised the employee's activities from a place of business in the state, or (4) whose local law governs the contract of employment under the rules of §§ 187–188 and 196.[13]

Finally appellants discern in *Neumeier v. Kuehner,* 31 N.Y.2d 121, 128–29, 335 N.Y. S.2d 64, 70–71, 286 N.E.2d 454 (1972) and *Rogers v. U–Haul,* 41 A.D.2d 834, 342 N.Y. S.2d 158 (2d Dept. 1973), "a recent New York trend back to *lex loci.*"

■ Mrs. O'Connor's arguments for the application of New York law are also powerful. She stresses that the decedent was a resident of New York, was employed in New York by a New York proprietorship, and worked in and out of his employer's office in New York. It would be unjust, plaintiff argues, if the rights of such a person should vary from day to day, depending on the state to which he happened to be dispatched to carry out his New York employer's business.[14] Plaintiff argues further that what appellants' perceive as a recent New York trend back to *lex loci* can be discerned only in cases in which the plaintiff was not a New York resident. She points instead to the one New York decision most nearly on point, *MacKendrick v. Newport News Shipbuilding & Dry Dock Co.,* 59 Misc.2d 994, 302 N.Y.S.2d 124 (Sup.Ct.N.Y. Co.1969), where a respected New York judge denied, with a considerable show of rhetoric, a contention similar to that advanced by the defendants here.[15]

**13.** Appellants cite a number of New York cases, decided before *Babcock v. Jackson, supra,* also cited in the Reporter's Note to Restatement § 184, which they argue apply the policies reflected in § 184. We do not find these relevant here. In *Barnhart v. American Concrete Steel Co.,* 227 N.Y. 531, 125 N.E. 675 (1920), participation in the New Jersey workmen's compensation program was optional, and plaintiff's decedent had elected to be covered. The Court of Appeals held that as a matter of contract law the plaintiff was bound by the terms of the New Jersey scheme, which excluded any other remedies against the employer, and therefore could not bring a wrongful death action against the employer in New York. Daniel O'Connor made no analogous election to be covered by Virginia law. In *Yoshi Ogino v. Black,* 304 N.Y. 872, 109 N.E.2d 884 (1952), aff'g 278 App.Div. 146, 104 N.Y.S.2d 82 (1st Dept. 1951), the appellate division reversed a decision striking a defense based on the exclusivity of North Carolina workmen's compensation remedies because it found that the North Carolina Workmen's Compensation Board would not necessarily be bound by a decision of the New York Board that plaintiff's injury had not occurred in the course of his employment. The appellate division concluded:

Possibly, as alleged by defendant, the North Carolina Workmen's Compensation Law may provide plaintiff's exclusive remedy. The determination of this question must await an examination of North Carolina law at such time as the merits of this defense may be considered.

278 App.Div. at 150, 104 N.Y.S.2d at 86. The choice of law question was not considered, doubtless because New York law was still firmly ensconced in the *lex loci delictus* methodology and the accident had occurred in North Carolina. Indeed, the choice of law question was not even certified to the Court of Appeals. 304 N.Y. 872, 109 N.E.2d 884. *DeRosa v. Slattery Contracting Co.,* 14 A.D.2d 278, 220 N.Y. S.2d 871 (1st Dept. 1961), aff'd, 12 N.Y.2d 735, 234 N.E.2d 217, 186 N.E.2d 415 (1962), was an even more straightforward application of the *lex loci* doctrine and hence is no longer a viable precedent.

**14.** This argument also is less impressive than might appear at first blush. O'Connor hardly engaged in estate planning on the basis that if he were killed in the course of employment, his estate would have a claim against any negligent third party.

**15.** In *MacKendrick,* the plaintiff's decedent was employed by a New York firm under contract with Westinghouse to manufacture cooling systems for submarines. Westinghouse was employed by the Navy to install the cooling systems, and Newport News, to construct the submarines. MacKendrick was sent to the defendant's shipyards in Virginia to repair inadequacies in the cooling system, and he was killed there in an industrial accident. The court held first that MacKendrick's employer was not a subcontractor of any Newport News undertaking within the meaning of the Virginia Workmen's Compensation Law, and therefore he was neither entitled to that statute's remedies, nor, more importantly, subject to its provisions barring wrongful death actions. However, the court did reach the choice of law question in determining whether to apply Virginia's limitation of wrongful death recoveries to $30,000. After an extensive review of the New York choice of law decisions since *Babcock,* the court concluded:

Our task, as noted, is to determine not what law we would choose to apply but what law the New York courts would apply. Although we do not pretend to full understanding of *Babcock v. Jackson, supra,* and the many decisions of the Court of Appeals in its wake and might think that, in the light of fifteen years of experience under *Babcock,* the departure from the certainty of the *lex loci delictus* rule was not such a famous victory as it first appeared to be, see Ehrenzweig, Conflicts in a Nut Shell 216–19 (3d ed. 1974); Cramton, Currie & Kay, Conflict of Laws 259–61 (2d ed. 1975), we see no indication that the highest court of New York has wavered in its determination to afford New York tort plaintiffs the benefit of New York law more favorable than the law of the *lex loci delictus* whenever there is a fair basis for doing so.

The line of such cases is impressive: *Kilberg v. Northeast Airlines,* 9 N.Y.2d 34, 211 N.Y.S.2d 133, 172 N.E.2d 526 (1961) (refusing to give effect to Massachusetts ceiling on recovery for wrongful death of New York resident in Massachusetts airplane crash);[16] *Babcock v. Jackson, supra,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (refusing to apply guest statute of Ontario, where accident occurred, to defeat claim of New York passenger); *Macey v. Rozbicki,* 18 N.Y.2d 289, 274 N.Y.S.2d 591, 221 N.E.2d 380 (1966) (refusing to apply Ontario guest statute against New York plaintiff even though she was staying at her relatives' home in Canada and trip began and was to end there); *Miller v. Miller,* 22 N.Y.2d 12, 290 N.Y.S.2d 734, 237 N.E.2d 877 (1968) (refusing to apply Maine limitation on recovery in wrongful death action where a New York resident was killed while in a motor vehicle operated by his brother and owned by his sister-in-law who were Maine residents); *Tooker v. Lopez,* 24 N.Y.2d 569, 301 N.Y.S.2d 519, 249 N.E.2d 394 (1969) (refusing to apply Michigan guest statute to accident in Michigan involving New York passenger). In *Rosenthal v. Warren, supra,* 475 F.2d at 443, we reviewed these cases and found, as did the court in *MacKendrick,* see note 15 *supra,* that they left us with:

> the overwhelming conclusion that, except for a federal case which relied heavily on a discredited state case, the strong New York public policy against damage limitations has triumphed over the contrary policies of sister states in every case where a New York domiciliary has brought suit. This conclusion is particularly striking in wrongful death actions where the New York policy, embedded in a state constitutional prohibition against damage limitations, has without exception been applied in suits brought for New York decedents since *Kilberg.*

Here the basis for applying the more favorable New York law rather than the law of the *lex loci* to *O'Connor* is at least as great as in the cases cited. Appellants have failed to furnish us with persuasive reasons to believe that, if confronted with the problem here presented, the New York Court of Appeals would turn away from the path it has consistently followed since *Kilberg* and

---

Clearly the public policy of our courts is to protect New York domiciliaries, wherever possible, from denial of a recovery in another jurisdiction . . . . .

Both logic and precedent mandate a construction consistent, whenever possible, with the State allowing a just recovery.

59 Misc.2d at 1010, 302 N.Y.S.2d at 140.

Although federal courts are no longer bound by the decisions of inferior state courts in the determination of state law, a decision by a lower court state judge in the mainstream of state decisions is entitled to respect. See Hart & Wechsler, The Federal Courts and the Federal System 708–10 (2d ed. 1973).

**16.** We followed *Kilberg* in two other cases arising from the same Massachusetts airplane acci-

dent, *Pearson v. Northeast Airlines, Inc.,* 309 F.2d 553 (2 Cir. 1962) *(en banc), cert. denied,* 372 U.S. 912, 83 S.Ct. 726, 9 L.Ed.2d 720 (1963), where the facts were identical with those in *Kilberg,* and *Gore v. Northeast Airlines,* 373 F.2d 717 (2 Cir. 1967), where the plaintiff executrix and decedent's children had removed from New York to Maryland before suit was brought. More recently we followed *Kilberg* in *Rosenthal v. Warren,* 475 F.2d 438 (2 Cir.), *cert. denied,* 414 U.S. 856, 94 S.Ct. 159, 38 L.Ed.2d 106 (1973), refusing to apply Massachusetts' wrongful death limitations statute in a malpractice suit brought by the widow of a New York citizen against a Boston physician and hospital, and cited with approval the *MacKendrick* decision discussed above.

subject a New York resident, employed in New York by a New York employer and based in New York, to Virginia law which prevents him or his estate from suing for negligence a non-employer alleged to have negligently injured or killed him at the worksite.[17] Accordingly we uphold the ruling of the district judge.[18]

All orders affirmed.

17. If it be said that the Virginia rule here at issue is less unreasonable than a limitation on recovery for wrongful death, which New York is prohibited from enacting by its Constitution, Art. I, § 16, or guest statutes, we find nothing to indicate either that this enters significantly into the choice of law determinations of the Court of Appeals or that it would not consider Virginia's restriction on the right to sue third parties for negligence at the worksite as being quite as unreasonable as a guest statute.

18. Appellants could argue that thus subjecting the insurer to New York's choice of law, which is more favorable to a plaintiff than Virginia's, demonstrates a hardship visited by *Seider* on the insurer and, because of an effect on future ratings, on the insured. However, exactly the same consequences would ensue if New York had authorized in terms a direct action on behalf of New York residents against insurers doing business in New York, and nothing in *Shaffer* affects our holding in *Minichiello, supra*, 410 F.2d at 110, that this would be constitutional.